IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| RYAN SMITH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 2003-cv-4179-JPG |
| ) | |
| RUDD EQUIPMENT COMPANY, Inc., ) | |
| ) | |
| Defendant. ) | |

### MEMORANDUM OPINION AND ORDER

**GILBERT, District Judge:**

This matter comes before the Court on Plaintiff's motion in limine (Doc. 26) and accompanying memorandum of law (Doc. 27), to which Defendant responded (Doc. 28) and Plaintiff replied. (Doc. 31). Because Defendant intends to offer expert testimony in support of the evidence presently at issue, the Court referred the question of the proposed expert's qualifications, see FED. R. EVID. 702, together with the admissibility of the evidence, see FED. R. EVID. 402, 403, to Magistrate Judge Phillip M. Frazier for a report and recommendation. (See Order at Doc. 39). Both Defendant (Doc. 37) and Plaintiff (Doc. 38) had filed supplemental briefs at that point. After conducting a *Daubert* hearing, see *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Magistrate recommended exclusion of both the expert's opinion and the other evidence. (Doc. 43). Defendant has since objected to that recommendation (Doc. 47) and Plaintiff responded to the objection. (Doc. 48). Having considered the matter de novo, see 18 U.S.C. 636(b); FED. R. CIV. P. 72(a), the Court will ACCEPT the Magistrate's

recommendation and exclude the evidence, as explained in more detail below.

Plaintiff Ryan Smith hails from Mt. Carmel, Illinois, a small border town in Wabash County due east of here.  Up until about a year-and-a-half ago, Smith's principal mode of transportation was a blue mountain bike he'd apparently fixed up at some point.  All that came to a screeching halt in the early morning hours of October 6, 2003, however, when a Rudd Equipment Company truck (which was also blue, ironically) driven by Timothy Walker took Smith out as he pedaled north on Illinois Route 1.  Smith was injured and his bike, destroyed.  According to Smith, he'd just left his friends Ryan and Andrea Bearden's house, having spent the night there, and was on his way home to get money so he could buy cigarettes for himself and his then-girlfriend, Bobbi Trottier, who'd also stayed at the Beardens' that night.  Pictures of the scene taken shortly after the accident show Smith's bike in the ditch on the west side of the road.  Because Smith was heading north when he was hit (and therefore adjacent to the east side of the road), the pictures suggest that the force of the collision was such that he was thrown across the southbound lane.  Other pictures reveal extensive damage to the front passenger-side fender of the truck; a significant portion of the fender just above the wheel well is missing.  This would probably lead most folks to say, from what we've seen thus far at least, that what we have here is a clear-cut case of just plain old negligence. But things aren't that simple.  For as we would later find out, Smith was no Boy Scout.  For one thing, consider who he hung out with at the time, for what it's worth.  Andrea Bearden–at whose house, recall, Smith spent the night before

the accident–is an admitted meth addict who says she smoked meth with Smith five to ten times "in the couple of months before the accident." (Andrea Bearden dep. at 27). Andrea's husband, Ryan, was himself fresh out of prison. And to round things out, Smith's best friend, Timothy Burton, would soon find himself doing six years at the Big Muddy Correctional Center, having been convicted on state charges of possession of meth and meth manufacturing chemicals. That aside, here's the evidence which really hurts Smith. A Triage® drug screening test performed in the emergency room just after the accident revealed the presence of at least 1,000 ng/mL of amphetamines and 50 ng/mL of tetrahydrocannabinoid (marijuana) in Smith's system; an unspecified blood alcohol test also pegged his blood alcohol concentration at .019. If Rudd could somehow get this evidence in front of the jury, the scales might just tip the other way.

Thus, Smith's motion in limine seeks to exclude "[a]ny mention or inference that [he] had drugs or alcohol in his system at the time of the occurrence herein." (Doc. 26 at 1). Principally grounded in FED. R. EVID. 403, Smith's arguments go something like this. First, the drugs. It's undisputed that the Triage® test doesn't quantify drug amounts beyond threshold quantities. Given that no other evidence of impairment exists in this case–i.e., evidence suggesting Smith was riding negligently at the time of the accident– the Triage® results are only relevant to the extent they are significant enough to suggest impairment in and of themselves. (They might also be relevant for impeachment, but that doesn't alter the Court's ruling.) Although Rudd's expert witness, Dr. Michael Mullins, tried to make that connection, Smith calls Mullins's scientific methodology

-3-

unreliable, see FED. R. EVID. 702, and argues that his opinion should therefore be excluded. Without such evidence, Smith continues, the Triage® results say little about how he was riding his bike on the morning in question. Of course, Smith must somehow deal with his deposition testimony in this case, that he'd smoked one-half gram of meth the evening before the accident. But he explains this away by noting that Rudd hasn't offered reliable evidence to explain the effects of meth on his bike riding. Moreover, if cases like *Marshall v. Osburn*, hold that alcohol is "extremely prejudicial," 571 N.E.2d 492, 497 (Ill. App. Ct. 1991), it follows that meth can only be more so. Accordingly, Smith concludes that the evidence of his drug use "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury," FED. R. EVID. 403, and should therefore also be kept out.

And then there's the alcohol. Recall that this evidence has two components: (1) Smith's deposition testimony of having drank one beer the afternoon before the accident (Smith dep. at 32), and (2) the blood alcohol test given at the hospital revealing his BAC at .019. Smith points out that the level of "alcohol [shown by the test] was less than .02, far below any conceivable level of intoxication or effect on [Smith's] activities." (Doc. 27 at *2). Further, Smith insists, "[i]mpairment is something that is relevant only if it would tend to prove that a person did or did not do something that is in dispute." (Doc. 31 at 1). And because the fact that he was riding his bike non-negligently at the time of the accident seems undisputed at this point, he concludes that any alcohol impairment just isn't relevant in this case.

Let's begin our analysis with the easier of the two issues, the evidence of alcohol consumption. Citing *Marshall v. Osburn*, the Magistrate recommended exclusion of this evidence. *Marshall* requires that the proponent of such evidence demonstrate "either directly or by reasonable inference, that the conduct of the individual at or before the accident was or may have been affected by the use of alcoholic beverages." 571 N.E.2d at 497. As we've already mentioned twice, Smith finds no evidence of impairment in this case. And he's probably correct, though that's an issue for the jury in the first instance. Granted, Rudd finds negligence in Smith's choice to ride "in the dark and in dense, patchy fog." (Doc. 47 at 12). But to call that "negligent" is tenuous at best, and the Court is unwilling to find Smith's prior-afternoon consumption of one beer sufficient to have affected that decision in any event. Alcohol causes slower reaction times and impairs one's ability to make quick decisions–neither of which is at issue here. Likewise, the unexplained .019 alcohol reading would also be of little help to a jury, and no mention of the scientific methodology underlying that finding was offered to establish its reliability. So while the Magistrate (and the parties) might have incorrectly relied on *Marshall* as binding precedent, see *Levitt v. H. J. Jeffries, Inc.*, 517 F.2d 523, 525 (7th Cir. 1975) (holding that federal law governs this question), his instincts were nevertheless correct. Rudd's objection on this point is overruled.

On now to the drugs, which include two interrelated pieces of evidence. One, recall that Smith admitted to smoking one-half gram of meth the evening before the accident. (Smith dep. at 32). Two, of course, is the Triage® results we've already

shaken hands with. No one disputes that none of this evidence would mean much to a jury if presented without further explanation; most folks just don't know what effect one-half gram of meth has on one's ability to ride a bike or exactly what the presence of 1000 ng/mL of meth in one's system means. Enter Dr. Mullins, Rudd's expert toxicologist who offered us his take on the situation. Here's how the Magistrate fleshed out Mullins's bottom line:

> [Magistrate]: Can you tell me, then, what, specifically, did the plaintiff do or fail to do because he was impaired by the meth, the alcohol, or the combination of the two? What, specifically, did he do or fail to do because of that impairment which caused or contributed to his injuries?
>
> [Mullins]: He failed to recognize the overtaking vehicle, and he failed to–
>
> \* \* \*
>
> [Magistrate]: So generally speaking, you're saying that he failed to anticipate that he was being overtaken by the truck–
>
> [Mullins]: Yes, sir.
>
> [Magistrate]: –and that his impairment is what specifically caused or contributed to his inability to appreciate that he was being overtaken by the truck and react properly or accordingly?
>
> [Mullins]: Yes, sir.

(Tr. Evid. Hearing, Doc. No. 51, at 74-75).

Rudd points out that the Court's March 1, 2005 Order referring this matter to the Magistrate cited two cases not addressed in the report and recommendation. The Court agrees that those cases are instructive, though probably not to Rudd's liking. For in the Court's judgment those cases only strengthen the conclusion that admitting the meth

and THC evidence in this case is inappropriate. Consider *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77 (1st Cir. 1998), first. Cocaine was the drug at issue there. The parties to that car wreck case crashed into each other as the plaintiff cocaine user-driver tried to pass another car traveling in front of him and in the same direction he was going; in so doing the plaintiff entered the oncoming defendant-trucker's path. Critically, the defendant argued that the plaintiff "caused the accident by recklessly initiating a passing maneuver in the face of obvious danger and placing his vehicle on the wrong side of the road." 161 F.3d at 79. What made that fact "critical" was the context established by the defense expert toxicologist, which the court described as follows: "[The expert] opined that cocaine intoxication resulting from a dose such as [the plaintiff took] results in impairments of perception, reflexes, reaction time, and judgment, and that such a degree of intoxication increases one's 'sense of mastery' and thus promotes risk taking." 161 F.3d at 85. In other words, the effect of the drug at issue–an increase in one's sense of mastery and promotion of risk taking–was precisely what could have made the plaintiff's conduct unreasonable and therefore negligent in the first place. The plaintiff arguably took an unreasonable risk in initiating the pass. So, too, we see with *Bocanegra v. Vicmar Serv., Inc.*, 320 F.3d 581 (5th Cir. 2003). That case involved marijuana use; the defendant drug user-driver there admitted to taking five or six hits eight hours before the accident and to have gotten high as a result. The accident, which occurred on an interstate highway, happened when the defendant swerved to miss a disabled car on the right-hand shoulder of the road adjacent to his

lane of traffic.  Another recent collision had caused the disabled car to be on the side of the road; and by swerving to avoid that car, the defendant entered the grassy center median and killed a man (the plaintiff in the case) who was standing there.  Ironically, the plaintiff was in the median because he'd been riding in the other car involved in the first accident with the car parked on the shoulder.  At any rate, a defense expert proffered testimony that levels of marijuana like that admittedly taken by the defendant would increase one's "weaving ability on the road and things like that," 320 F.3d at 589, which again was precisely the issue there.  See 320 F.3d at 587.

Unlike the defendants in *Ruiz-Troche* and *Bocanegra*, Rudd hasn't made a connection between meth or THC use in the abstract and any conceivable negligence in this case.  Drug or alcohol use is probative of negligence to the extent it suggests one didn't act as a reasonable person would have acted.  Thus, an alcohol impaired driver is negligent if alcohol renders his ability to react unreasonable.  But that's not necessarily so, and unimpaired drivers might react unreasonably slowly in their own rights–perhaps because they're tired or preoccupied.  Which brings us to the particular.  Although it's not entirely clear, Mullins's theory seems to be that meth affected Smith's ability to make a sound choice whether to ride his bike at all that day–or at least until the fog burned off and he could be seen better.  His testimony quoted above also suggests that he thinks Smith should have pulled off the road and waited for the approaching truck to pass by.  Setting aside the effects of the drug, this is as we've said the most tenuous evidence of negligence.  Note that by characterizing the problem as one of "judgment," Mullins is

-8-

able to extract from the scientific literature statements which seem to support his position, such as "[i]ncreased impulsivity and impaired judgment . . . are associated with methamphetamine use." Thomas E. Nordahl, M.D., Ph.D., Ruth Salo, Ph.D., Martin Leamon, M.D., *Neuropsychological Effects of Chronic Methamphetamine Use on Neurotransmitters and Cognition: A Review*, J. Neuropsychiatry Clin. Neurosci., Summer 2003 at 322. But that's problematic in itself, for several reasons. For one thing, the studies Mullins cites focus on the effects of long-term meth use, and the conclusions reached in those studies rely on laboratory tests. See e.g., Andrea Lawton-Craddock, Sara Jo Nixon, Rick Tivis, *Cognitive Efficiency in Stimulant Abusers With and Without Alcohol Dependence*, Alcohol Clin. Exp. Res., March 2003 at 458-459 (describing the tests given during that study as follows: (1) "[o]n this task, subjects pressed the space bar on the keyboard every time a visual cue (a star) appeared on the computer screen," (2) "[t]he task requires that subjects use problem-solving techniques to acquire a sorting pattern and to change their approach as the computer modifies sorting criteria," (3) "[t]o assess visuospatial skills and mental rotation abilities, subjects were asked to indicate in which hand the man was holding the briefcase by pressing the 'right' or the 'left' key on the response board," (4) "[t]his computerized task, which assesses visual perceptual skills, required that subjects identify subtle differences in geometric shapes," (5) "[o]n this computerized task that assesses short-term memory, subjects were shown digits within sets, varying in size from one to six digits in length," (6) "[t]his [test] requires responding with symbols assigned to each of nine digits (i.e., 1 to 9)."). But in this case

it's not been established that Smith was a long-term meth user within the meaning of those studies; and even assuming so for the sake of argument, neither the studies nor Mullins explains how the results of those tests extrapolate to one's ability to ride a bike. In fact, Mullins's cited article appears to contradict his conclusion. "Studies using sleep-deprived individuals revealed that administration of amphetamines reduced reaction times and improved performance." Nordahl, et al, at 321. Therefore, the effect meth may or may not have had on Smith's ability to react to the truck approaching him (and approaching him from behind to boot) isn't even arguably clear; for all we know meth might have *improved* his reaction time. Moreover, Mullins admitted he'd never seen someone on meth try and ride a bicycle, Tr. Evid. Hearing at 72, nor "was he aware of anyone who has testified concerning the effects of mixing methamphetamine and alcohol and impairment on physical and mental abilities." Tr. Evid. Hearing at 72. So his opinion has even less relevance to the question whether Smith was negligent in this case. That said, Rule 403 requires us to balance the probative value of the proffered evidence with its unfairly prejudicial effect. And on the topic of "prejudicial effect," the Court agrees with the Magistrate that the mere mention of "meth" is "downright explosive." (Doc. 43 at 4). It follows that to introduce such evidence in this case would invite the jury to render its verdict on an improper basis: Smith's meth use, not his bike riding that day. Accordingly, given the low probative value of this evidence relative to its unfairly prejudicial effect, the Court finds that it must be excluded. Rudd's objection on this point is therefore also overruled.

Note that the above discussion assumed Mullins's expert testimony admissible in the first instance.  FED. R. EVID. 702.  It is not.  The problem we've just identified–that Mullins's opinion on the effects meth has on one's ability to drive isn't well-supported by the literature–is one strike against him.  See *Daubert*, 509 U.S. at 594.  Similarly, Mullins admitted that he didn't know who performed the Triage® test on Smith and therefore never talked to that person.  In terms of raw significance, that should count for two strikes.  Indeed, the principal study Mullins relied on found the error rate of non-research-analyst-administered Triage® tests significantly higher than that of tests given by properly trained personnel.  (Evid. Hearing Def. Ex. 9 at 498).  This is consistent with the affidavit of Smith's expert.  See Christopher Long ltr. of August 8, 2004, Doc. 27, Ex. 9 at *2 ("The Triage test is very subjective and lacks appropriate specificity.  The subjectivity is in the hands of the person looking at the Triage card.").  And on that note the Court's independent research revealed that, in the two cases the Court found allowing Triage® results into evidence, the importance of proper test administration was paramount.  *Jones v. State*, 881 So. 2d 209, 218 (Miss. Ct. App. 2003) ("She identified the test that she performed on Jones's urine specimen as the triage drugs of abuse screening test.  She had performed this specific test hundreds of times.  She testified that each triage test kit comes with instructions and that she had read the instructions."); *In the Interest of G.B., P.B., I.B., M.L., and J.B., Children*, No. 07-01-0210-CV, 2003 WL 22327191 at * 3 (Tex. App. Oct. 10, 2003) ("[The chemistry supervisor] explained that the test required a lab technician to place a portion of the patient's urine sample on a 'card' containing

antibodies for one of seven different drugs to determine whether any one of them was present in the sample. If a visible line appeared on the card as a result of the reaction between the patient's sample and the drug antibody, then the technician would interpret the test as 'presumptive[ly] positive' for that drug.").

Because the probative value of the evidence in this case of (1) the Triage® and blood alcohol test results taken at the Wabash General Hospital on October 6, 2003, (2) Smith's deposition testimony that he smoked one-half gram of meth the night before the accident, (3) Smith's deposition testimony that he drank one beer the afternoon before the accident, and (4) any mention or inference that Smith had drugs or alcohol in his system generally, are substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, FED. R. EVID. 403, they are excluded from the trial in this matter. Plaintiff's motion in limine to that effect (Doc. 26) is therefore **GRANTED**.

**IT IS SO ORDERED.**

**Dated: June 8, 2005.**

                                                 **/s/ J. Phil Gilbert**
                                                 **J. PHIL GILBERT**
                                                 **U.S. District Judge**